**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

MELISSA PRINGLE,                    *
                                    *
      Plaintiff,             *
                                    *
vs.                                 *    CV 112-044
                                    *
FAMILY DOLLAR STORES OF             *
GEORGIA, INC.,                      *
                                    *
      Defendant.             *
                                    *

---

## O R D E R

---

Plaintiff, Ms. Melissa Pringle, filed this case alleging that Defendant, Family Dollar Stores of Georgia, Inc., terminated her employment as a store manager because of her race and sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e) et seq., and because of her alleged disability in violation of the Americans with Disabilities Act ("A.D.A."), as amended, 29 U.S.C. § 12112 et seq. Plaintiff also brings a negligent supervision claim against Defendant under Georgia law.

Before the Court are Defendant's motion for summary judgment (doc. no. 55) as to all Plaintiff's claims on the merits and on the doctrine of judicial estoppel, Plaintiff's motion for partial

summary judgment (doc. no. 56) on her A.D.A. claim, Defendant's request (doc. no. 71) under Federal Rule of Civil Procedure 11 for attorneys' fees and costs incurred in responding to Plaintiff's allegedly frivolous motion for partial summary judgment, and Plaintiff's objection to the declaration of Mr. Todd Jarrett (doc. no. 74). Upon consideration of the record evidence, the briefs submitted by counsel, and the relevant law, the filings are resolved as set forth below.

## I. BACKGROUND

This case arises out of the termination of Plaintiff's employment after she failed to return from an eight month medical leave of absence due to bunion-removal surgery. She then brought this suit claiming that she was fired on account of her race, sex and her alleged disability. The facts material to the above motions follow.

### A. Factual Background

#### 1) Defendant

Defendant is a subsidiary of Family Dollar Stores, Inc. ("Family Dollar") and is an employer as contemplated by Title VII and the A.D.A. (Barkley Decl. ¶ 1; Ans. to Pl.'s Am. Compl. ¶ 3; see Am. Compl. ¶ 3.) Defendant sells items such as clothing, household goods, cosmetics, health and beauty aids, and food at

discounted prices. (See Barkley Decl. ¶ 7.) Defendant's stores are organized into numerical districts, which are comprised of between fifteen and thirty individual stores. (Id. ¶¶ 8-9.) Districts are managed by district managers or area operations managers, and individual stores are managed by store managers. (Id. ¶¶ 10-11, 16.)

### 2) Ms. Stacey Bales

In the summer of 2008, Ms. Stacey Bales ("Bales") became the district manager responsible for the Wrightsville store along with nineteen other stores. She supervised the store manager for each of those twenty stores, including Plaintiff. (Pringle Dep. at 84; Bales Dep. at 7.) She served as district manager until July 2010. (Def.'s Resps. to Pl.'s First Interrogs. at 17-18.) Bales was the ultimate decision maker for Plaintiff's requests for work restrictions, such as a request to work only part-time rather than full-time due to an alleged physical disability, and for Plaintiff's termination. (Halstead Dep., Ex. 50; Bales Dep. at 7, 19.) Bales never disciplined or suspended Plaintiff, and Plaintiff never lodged any complaints against Bales prior to her separation in 2010. (Pringle Dep. at 83-84.) Aside from Plaintiff's complaint, Bales has never been accused of unfair treatment in the workplace or been the subject of complaints of unfair treatment within Defendant's organization. (Bales Dep. at

3

230-31.) However, Plaintiff did not consider Bales to be a good district manager. (Pringle Dep. at 84.) She stated that Bales regularly failed to answer phone calls, believed that Bales was too demanding of her, was negative, and had an attitude problem. (Id. at 84-85.)

### 3) Plaintiff

Plaintiff is an African-American female. (Ans. to Am. Compl. ¶ 13; see Am. Compl. ¶ 13.) Defendant hired Plaintiff as an assistant store manager at Defendant's Wadley, Georgia, store in the first quarter of 2005 (Pringle Dep. at 75, 78), then promoted Plaintiff to store manager about one year later and relocated her to Defendant's Wrightsville, Georgia, store. (Id. at 79-80.) She remained at the Wrighstville store until her last day of work for Defendant on June 8, 2009. (Pringle Dep. at 80.) Plaintiff earned a salary of approximately $523.00 per week when Defendant automatically terminated her employment on January 31, 2010, for failure to return from leave. (Barkley Decl. ¶ 17; Bales Dep., Pl.'s Ex. 29; Barkey Dep. at 30, 32)

### 4) The Store Manager Position

During Plaintiff's employment with Defendant, store managers were responsible for managing the daily operations of a store; employee hiring, development, discipline, supervision, and safety; and administering Defendant's policies found in the store

4

associate handbook. (Barkley Decl. ¶ 11; <u>see</u> Pringle Dep. at 97-99, 101 & Exs. 1-2.) Relevant to this action, store managers were responsible for administering attendance and leave of absence policies for store employees. (Pringle Dep. at 98-99 & Ex. 2.) Defendant's leave of absence policy provides:

> All requests for leaves of absence should be made in writing by the associate prior to the beginning of the leave. The written request should be submitted to the Store Manager (or for leaves requested by [the] Store Manager, to the District Manager). If the leave is approved, you will be informed of the terms and conditions of the leave, including the effective date and the ending date of the leave. An associate desiring an extension of his or her leave should submit a written request prior to the ending date of the absence . . . . It is your responsibility to provide the written information necessary to document the leave of absence.

> With proper authorization, you may be permitted to take a leave of absence up to a period of three months. This may be extended by your written request to your immediate supervisor and approval of the Human Resources Department up to an additional three months. Should a period of absence or a period of absences exceed six months, the Associate will be considered terminated . . . . Additional leave beyond six months will normally be considered on a case-by-case basis as a reasonable accommodation for qualified individuals with disabilities absent undue hardship. However, such leave must be approved by the Human Resources Department to ensure that the Company does not endure an undue hardship due to the job vacancy.

(<u>Id.</u>, Ex. 2.) If a request for a leave of absence was granted, the employee bore the responsibility to maintain communication at all times with her supervisor and Defendant. (Halstead Dep. at

93.) The associate handbook also provides examples "of situations for which discipline up to and including immediate discharge may be imposed[,]" including an employee's "failure to contact [her] supervisor when late, absent, and as required during a leave, and at the expected time of return from a leave of absence." (Pringle Dep., Ex. 2.) Defendant has two forms to request leaves of absences, one to be used prior to going on a leave of absence and one during the leave of absence. (Halstead Dep. at 28-29.) Defendant allowed eligible employees to take twelve weeks of leave for their serious health conditions under the Family and Medical Leave Act ("FMLA"). (Pringle Dep., Ex. 2.) FMLA leave ran concurrently with Defendant's allowed six months of leave. (Id.)

Store managers were also expected to be able to lift up to 55 pounds from floor level to above shoulder height and to meet the demands of frequent walking, standing, stooping, kneeling, climbing, pushing, putting, and repetitive lifting "with or without reasonable accommodation." (Pringle Dep. at 97 & Ex. 1.) At the time, store managers were salaried employees expected to work full-time, which was defined as 52 hours per week.[1] (Barkley Decl. ¶ 13.)

When Plaintiff applied for the store manager position, she did not notify Defendant that she had any restrictions on her

---

[1] In contrast, assistant store managers were compensated on an hourly basis and were eligible for overtime pay. (Barkley Decl. ¶ 13.)

ability to do the job. (Pringle Dep. at 88.) Nor did Plaintiff identify or request any accommodations with or alterations to the standard duties and responsibilities for a store manager. (Pringle Dep. at 92-93.) At her deposition, Plaintiff confirmed that she did not have any physical limitations in performing her job. (Id.) Prior to her surgery in June of 2009, Plaintiff never reported any medically-related issue with her foot to Defendant. (Id.) Plaintiff described herself as a "good" store manager and indicated that she was able to perform all the functions and responsibilities of her position "satisfactorily." (Id. at 97-98.)

During Plaintiff's employment with Defendant, store managers' salaries were determined on an annual basis by district managers with the aid of a pay modeler. (Barkley Dep. at 14.) The pay modeler suggested salary ranges based on various factors, including geographic location, risk class, and sales volume for a given store. (Id.) Additionally, store managers who transferred laterally to other stores would not see their salary reduced if the pay modeler suggested a lower salary range for the store. (Id. at ¶ 15.)

Defendant did not employ part-time store managers or officially have a "holding manager" position during the times relevant to this action. (See Id., ¶ 12; Barkley Dep. at 44.)

Unofficially, Defendant used "holding managers," also known as "floaters," to substitute for managers where needed. (Pringle Dep. at 34; Bales Dep. at 69, 140; Barkley Dep. at 44; Halstead Dep. at 45.) For example, a holding manager would occasionally fill in for a manager on a leave of absence or a manager who had suddenly left his or her position. (Bales Dep. at 69.)

### 5) Plaintiff's Surgery

Plaintiff observed that her right foot swelled and hurt after she spent "a long period of time" working. (Pringle Dep. at 92, 179.) She could stand for more than two hours at a time but could not stand the entire day before she experienced pain in her foot. (Id. at 180.) Plaintiff would occasionally sit down in the store's office when her foot began hurting, but could not recall how often she had to sit down throughout the week. (Id. at 181-82.) Prior to her surgery, Plaintiff had not taken medication for her foot nor had she received medical treatment for her discomfort. (Id. at 181; Smith Dep. at 51.)

On March 31, 2009, Thomas Smith, M.D. ("Dr. Smith"), a podiatrist, diagnosed Plaintiff with a bunion on her right foot. (Smith Dep. at 10 & Ex. 1.) A bunion is an "angular deformity on the foot where the bones that make up the great toe stick out on the inside of [the] foot . . . . [It] can be painful to shoe pressure and . . . within the joint itself." (Id. at 10-11.)

8

Plaintiff's bunion was a "significant deformity to her great toe" and was exaggerated when she stood on it. (Id. at 67 & Ex. 1.) Dr. Smith observed that Plaintiff's bunion experienced a "slow progression of deformity and pain over time." (Id. at 64 & Ex. 1.) Plaintiff indicated that she had had the bunion since childhood and complained to Dr. Smith of "pain within the joint as well as difficulty with shoe fit." (Id. at 11, 63 & Ex. 1.) However, Dr. Smith noted that Plaintiff walked with a normal gait, did not wear a corrective shoe, and did not limp. (Id. at 23-24, 29 & Ex. 1.)

Days before her surgery, Plaintiff notified Bales that she would be taking a medical leave of absence to undergo a procedure to remove her bunion. (Pringle Dep. at 52; Bales Dep. at 21, 168.) Bales informed Plaintiff that she would place a holding manager in her position and that Plaintiff's job was secure so long as she communicated with Bales and turned in the proper documentation for her leave. (See Bales Dep. at 37.)

Plaintiff had surgery to correct the bunion on or about June 12, 2009, which involved general anesthesia. (Pringle Dep. at 95; Smith Dep. at 16, 66.) Dr. Smith cut the bone at the base of the first metatarsal and inserted two screws to realign the first metatarsal. (Smith Dep. at 65.) He then inserted a "joint release

at the level of the joint to straighten the toe on a newly straightened first metatarsal." (Id.)

### 6) Plaintiff's Leave of Absence

On June 8, 2009, prior to the operation, Plaintiff contacted Defendant and requested to apply for FMLA leave.[2] (Jarrett Decl., Ex. 1.) Defendant opened a claim file for Plaintiff's leave. (Id.) On June 12, 2009, Defendant mailed a letter confirming its receipt of Plaintiff's FMLA leave of absence request to Plaintiff's mailing address of record. (Id., Ex. 2; Pringle Dep., Ex. 4.) A health care provider certification form ("provider certification") was attached to the letter to be submitted to Defendant for approval of Plaintiff's leave. (Jarrett Decl., Ex. 2.) The letter notified Plaintiff that she was required to confirm her return-to-work date with her district manager prior to the end of her leave and to promptly notify her district manager and Defendant if her return-to-work date changed. (Id.) Dr. Smith completed and submitted the certification form on June 12, 2009, which indicated that

---

[2] Defendant had contracted with Aon Hewitt, a third party vendor to administer leaves of absence on its behalf and according to its policies. (Barkley Dep. at 11.) Aon Hewitt's duties were to coordinate with Defendant's employees regarding the requisite documentation for an employee's request for a leave of absence, to evaluate the employee's eligibility for leave, and to communicate with the employee and Defendant regarding requests and approval for extensions of leave, if any. (Id. ¶ 4.) The vendor used Defendant's letterhead on its official correspondence to Plaintiff and held itself out to be Defendant. (See generally Barkley Dep. at 11; Halstead Dep. at 111.) Accordingly, the Court will consider Plaintiff's interactions with the third-party vendor as if it were with Defendant.

Plaintiff would be out on leave from June 12, 2009, until September 13, 2009. (Jarrett Decl., Ex. 3; Pringle Dep., Ex. 5.)

By letter dated June 25, 2009, Defendant notified Plaintiff that her request for FMLA leave had been approved through September 3, 2009. (Jarrett Decl., Ex. 4; Pringle Dep., Ex. 6.) The letter advised Plaintiff of her obligations for returning to work, which included confirming her return date with her supervisor and submitting a completed fitness for duty form. (Jarrett Decl., Ex. 4.) Defendant notified Bales of Plaintiff's leave of absence on August 25, 2009. (Jarrett Decl., Ex. 1.)

### 7) Plaintiff's First Extension of Her Leave of Absence

By letter dated August 25, 2009, Defendant confirmed that Plaintiff was scheduled to return to work on September 14, 2009, and warned that if she did not return to work on this date, that she could be considered to have voluntarily resigned per Defendant's policies. (Id., Ex. 5; Pringle Dep., Ex. 7.) Plaintiff contacted Defendant the same day seeking an extension of her return-to-work date. Defendant advised Plaintiff that she would need to submit an updated provider certification. (Jarrett Declaration, Ex. 1.) Plaintiff submitted a fitness for duty form, dated September 8, 2009, requesting an extension of leave through October 5, 2009. (Jarrett Decl., Ex. 6; Pringle Dep., Ex. 8.)

Defendant approved Plaintiff's request on September 16, 2009. (Jarrett Decl., Ex. 1.)

### 8) Plaintiff's Second Extension of Her Leave of Absence

On September 17, 2009, Defendant contacted Plaintiff and again advised her that she must submit an updated provider certification to request an extension of her leave and to submit an updated fitness for duty form prior to her return-to-work date. (See Jarrett Decl., Ex. 1.) Plaintiff contacted Defendant on October 5, 2009, regarding an extension of her leave through approximately November 2, 2009. (Id.) Plaintiff reviewed the extension process with Defendant and requested that a provider certification be faxed to her physician. (Id.) By letter of the same date, Defendant confirmed its receipt of Plaintiff's second request to extend her leave and noted that the request was for "non-FMLA leave." (Id., Ex. 7; Pringle Dep., Ex. 9.) It attached a provider certification to be completed and submitted to Defendant within fifteen days. (Jarrett Decl., Ex. 7.) On October 6, 2009, Defendant received an updated provider certification, which provided for a return to work date of November 9, 2009. (Jarrett Decl., Ex. 9; Pringle Dep., Ex. 10.)

By letter dated October 23, 2009, Defendant informed Plaintiff that her extension request had been approved. (Jarrett Decl., Ex. 11; Pringle Dep., Ex. 34.) The letter advised

Plaintiff that she was not considered eligible for additional leave under the FMLA or other applicable law and that she thereby was not legally entitled to job protection. (Jarrett Decl., Ex. 11.) The letter further advised Plaintiff that she would need to confirm her return to work date with Bales prior to returning to work.[3] (Id.)

### 9) Plaintiff's Third Extension of Her Leave of Absence

By phone call on November 3, 2009, Plaintiff discussed with Defendant the fitness for duty form that she received in the mail from Defendant. (Jarrett Decl., Ex. 1.) On the same date, Defendant received a fitness for duty form completed by Dr. Smith that released Plaintiff to return to work full time with no restrictions on January 4, 2010. (Jarrett Decl., Ex. 12; Pringle Dep., Ex. 12.) Defendant acknowledged receipt of the fitness for duty form by letter dated November 6, 2009, and indicated that Defendant would review the request once Plaintiff submitted an updated provider certification. (Jarrett Decl., Ex. 13; Pringle Dep., Ex. 13.)

---

[3] By letter dated October 19, 2009, Defendant advised Plaintiff that she was scheduled to return to work on November 9, 2009, and that prior to her return date she was to submit a fitness for duty form and to confirm her return-to-work date with her district manager. (Jarrett Decl., Ex. 10; Pringle Dep., Ex. 11.) The letter warned that if Plaintiff did not return to work on November 9, 2009, or contact her district manager, she would be "subject to [Defendant's] attendance policies and may be considered to have voluntarily resigned from the company." (Jarrett Decl., Ex. 10.)

Plaintiff contacted Defendant on November 6, 2009, and Defendant advised Plaintiff that the six-month maximum leave offered to employees would end in December.[4] (Jarrett Decl., Ex. 1.) By letter dated November 23, 2009, Defendant advised Plaintiff that she had exhausted all of her approved leave time and that she must make arrangements to return to work.[5] (Jarrett Decl., Ex. 14; Pringle Dep., Ex. 15.) The letter further advised Plaintiff that if she still had restrictions, she must contact Defendant. (Jarrett Decl., Ex. 14; Pringle Dep., Ex. 15.) If she failed to do so, Defendant warned that Plaintiff might be considered to have voluntarily resigned from her position. (Jarrett Decl., Ex. 14; Pringle Dep., Ex. 15.)

The next day, Defendant mailed a letter to Plaintiff advising her that Defendant was unable to review her extension request because Plaintiff had not yet submitted a provider certification. (Jarrett Decl., Exs. 1, 15; Pringle Dep., Ex. 17.) The letter warned that if Plaintiff did not complete and return the form within seven days, her leave would be closed and any absences would be subject to Defendant's attendance policy. (Jarrett Decl., Exs. 1, 15; Pringle Dep., Ex. 17.) On December 8,

---

[4] Plaintiff testified that she was unaware of the six-month policy. (Pringle Dep. at 129.)

[5] Plaintiff testified that she cannot recall whether she received this letter, and this letter is missing from Halstead's investigation files. (Pringle Dep. at 129; Halstead Dep. at 154.)

14

2009, Defendant informed Plaintiff that her case would be forwarded to its human resources department for a determination. (Jarrett Decl., Ex. 1.)

In late November or early December of 2009, Plaintiff spoke with Bales about her return to work. They agreed that Plaintiff would return in January, provided that Plaintiff communicated with Bales and submitted the proper documentation for her leave. (Bales Dep. at 212.)

Plaintiff submitted an updated, completed health care provider certification form dated December 10, 2009, indicating that Plaintiff would return to full-time work on January 4, 2010. (Smith Dep., Ex. B.) But Plaintiff did not return to work on January 4, despite being cleared by her doctor to do so.

### 10) Plaintiff's Recovery

Plaintiff met with Dr. Smith for a number of follow-up appointments to gauge the progress of her recovery and to prescribe any additional measures to aid her recovery. (See generally Smith Dep. at 18-43 & Ex. 1.) At her November 17, 2009, appointment, Dr. Smith noted that Plaintiff was "pleased and encouraged" with her recovery. (Smith Dep. at 36 & Ex. 1.) According to Dr. Smith, Plaintiff had "markedly improved" and "had completed her physical therapy program with a reduction in pain and increased movement of her toe." (Id.) At that time, she

had "returned to near full activity" with "little, if any, pain or discomfort." (Id.) Of particular note to Dr. Smith, Plaintiff's confidence in her foot had grown. (Id. at 36-37 & Ex. 1.) Dr. Smith and Plaintiff planned on her returning to work by January of 2010. (Id. at 37 & Ex. 1.)

### 11) William Logan Warbington, Plaintiff's White Male Replacement

William Warbington ("Warbington") began his employment with Defendant on July 17, 2006, as an assistant store manager at Defendant's Mt. Vernon, Georgia, store. (Barkley Decl. ¶ 18 & Ex. 1.) He was compensated at a rate of $6.00 per hour. (Id.) He subsequently resigned and was re-hired by Defendant on December 18, 2008, as an assistant manager at Defendant's Soperton, Georgia, store. (Id. ¶ 20 & Ex. 1.) He was compensated at a rate of $8.00 per hour. (Id.) On May 24, 2009, Warbington transferred to one of Defendant's stores in Dublin, Georgia, and was promoted to store manager. (Id. ¶ 21.) Based on the sales volume and geographic location of the Dublin, Georgia, store, Warbington was compensated at a rate of $600 per week. (Id. at 21 & Ex. 1.)

On July 5, 2009, Bales, Warbington's district manager, transferred him to the Wrightsville store to serve as a holding manager while Plaintiff was on approved leave. (Bales Dep. at 69, 169 & Ex. 35.) Consistent with Defendant's internal policies,

Warbington's salary was not reduced when he transferred to the Wrightsville store despite its comparatively lower sales volume. (Barkley Decl. ¶ 24.) When Plaintiff's employment was automatically terminated for failing to return from leave, Warbington filled her position at the Wrighstville store until he was subsequently transferred to another store. (Bales Dep., Ex. 35.) Ultimately, Warbington's employment with Defendant was terminated on April 21, 2013. (Barkley Decl. ¶ 25.)

### 12) Plaintiff's Fourth Extension of Her Leave of Absence

Plaintiff was aware that she was not on an approved leave of absence as of January 5, 2010, because she had not returned to work or provided the correct paperwork to obtain approval for an extension of leave. (Pringle Dep. at 146.) On January 8, 2010, Defendant called her and left a voicemail to determine whether she had resumed her duties at the Wrightsville store. (Jarrett Decl., Ex. 1.)

On January 12, 2010, Plaintiff contacted Defendant and indicated that she intended to return on January 19, 2010. (Jarrett Decl., Ex. 1.) During the call, Plaintiff said that her physician told her that she was physically unable to work the extended hours at the Wrightsville store. (See id.) Also on January 12, 2010, Bales contacted Defendant to discuss Plaintiff's return to work options because her leave time was

exhausted and she was not able to return to work. (Jarrett Decl., Ex. 1.)

### 13) Plaintiff's Request to Return to Work with Restrictions

Plaintiff met with Dr. Smith again for a follow-up appointment on January 12, 2010. (Smith Dep. at 37-41.) Though Dr. Smith explained that the surgery would not provide a "100%" fix (id. at 16), Plaintiff noted good improvement and "far less pain" (id. at 38). Dr. Smith observed that the pain was "much improved over the preoperative state in terms of . . . the great toe joint, . . . soreness[,] and shoe irritation." (Id.) In other words, Plaintiff reported that she was better off than she was prior to surgery. (Id.) "[Plaintiff] was very pleased and would not trade her foot back." (Id.) During the appointment, Plaintiff represented to him that she was counseled by Defendant to delay her return date until later in January and to return part time. (Id.; Pringle Dep. at 150.)

Dr. Smith described the conversation as "unique" because he had already cleared her to go back full-time when she said that she was offered this part-time return arrangement. (Smith Dep. at 40-41.) Based on these representations, Dr. Smith agreed, stating in his deposition that "[i]f an employer is willing to do some transitioning with part-time employment or something like that, that sounds reasonable to me." (Id. at 39, 76.) He further

18

confirmed that there was no medical reason for the part-time request. (<u>Id.</u> at 40.)

Dr. Smith completed a provider certification dated January 12, 2010. (Pringle Dep. at 155 & Ex. 16.) Under the "[c]an the employee do work of any kind?" prompt on the form, Dr. Smith indicated that Plaintiff "can do [her] job." (Pringle Dep. Ex. 16.) Dr. Smith also marked on the form that Plaintiff required a reduced schedule of "26 hours/week" and "8 hours/day." (<u>Id.</u>) Under the prompt, "Return Date: Date employee can return to work at his or her normal schedule[,]" Dr. Smith marked January 19, 2010. (<u>Id.</u>)

On January 14, 2010, Plaintiff called Defendant to verify whether it had received her provider certification and requested that the form be used in place of her fitness for duty form because it detailed her restrictions. (Jarrett Decl., Ex. 1.) The requested restrictions were forwarded to Defendant's human resources department for approval (<u>id.</u>), which forwarded the requested restrictions to Bales to determine whether the Wrightsville store could work with the requested restrictions. (Halstead Dep., Ex. 50.)

Bales responded by e-mail, "No these restrictions [cannot] be met." (<u>Id.</u>) The denial of her restrictions request was never communicated to Plaintiff. (<u>See</u> Bales Dep. at 112-13; Halstead

Dep. at 83-84, 89.) Defendant did not consider other alternatives to that proposed by Plaintiff and did not directly request Plaintiff to submit alternatives, justifying its actions on its policy that employees bear the responsibility to propose alternative restrictions to their supervisor. (See Bales Dep. at 58-59; Halstead Dep. at 48, 75.)

During a phone call with Plaintiff on January 20, 2010, Defendant advised Plaintiff to keep in contact with Bales about her leave because her non-FMLA leave had expired. (Jarrett Decl., Ex. 1.) Plaintiff opted not to stay in regular contact with Bales or the Human Resources Department because she purportedly was relying on Bales to contact her about options regarding her restrictions request. (Pringle Dep. at 166-67.)

### 14) Plaintiff's Automatic Termination

Plaintiff's employment with Defendant was automatically terminated on January 31, 2010. (Barkley Dep. at 16-17 & Ex. 58.) On February 2, 2010, Defendant received notice that Plaintiff's employment had been terminated and closed her leave file. (Jarrett Decl., Ex. 1.) On February 22, 2010, Bales manually entered a personnel action form into Defendant's record-keeping system, which indicated that Plaintiff resigned under the separation code for "failure to return from leave." (Bales Dep. at 72, 75 & Ex. 29; see Barkley Dep. at 9, 24.) The personnel

action form indicated that Plaintiff was eligible for rehire. (See Bales Dep., Ex. 29.)

Plaintiff contacted Bales on March 9, 2010. (Id. at 172.) Plaintiff learned of her termination during this conversation. (Pringle Dep. at 170-73.) Bales told Plaintiff that she was "rehireable" and eligible to apply for another position. (Pringle Dep., Ex. 3; see Bales Dep. at 213.) Plaintiff did not reapply for a position with Defendant, acknowledging she chose not to because she was "angry." (Pringle Dep. at 60-61, 200-01.) Neither did Plaintiff check to see if a position was available.[6] (Pringle Dep. at 60-61.)

On March 10, 2010, Plaintiff sent Bales a letter challenging her termination of employment from Defendant. (Pringle Dep. 101 & Ex. 3.) Defendant initiated an investigation into Plaintiff's complaint in March 2010, and informed Plaintiff on April 6, 2010, that her termination was upheld. (Halstead Dep. at 33, 84.)

### B. Procedural History

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 14, 2010, alleging race, sex, and disability discrimination. (Pringle Dep.

---

[6] Plaintiff's evidence shows that Ms. Erica Quarterman completed a paper application for a cashier position with Defendant. (Quarterman Dep. at 18.) Thereafter, she was internally promoted, without completing an application, to an assistant manager position and a store manager position. (Id. at 19, 21.)

Ex. 28 at Bates DEF0558.) By letter dated January 10, 2012, the EEOC found reasonable cause to believe that discrimination had occurred and issued Plaintiff a notice of dismissal and right to sue letter.

On March 30, 2012, Plaintiff filed the instant lawsuit against Defendant. Plaintiff amended her complaint on June 24, 2012, raising claims for: (1) disability discrimination; (2) race discrimination; (3) sex discrimination; and (4) negligent supervision. In her prayer for relief, Plaintiff seeks declaratory and injunctive relief, compensatory damages, lost wages and other benefits, punitive damages, interest, costs and expenses of litigation, and attorney's fees.[7]

## II. PLAINTIFF'S OBJECTION TO THE JARRETT DECLARATION

Defendant uses the declaration of Mr. Todd Jarrett, a representative of the entity (Aon Hewitt) that administers Defendant's leave policy, to support its motion for summary judgment. Records are attached to his declaration that he refers to and relies on throughout his statement. The declaration and attached records describe the numerous communications between

---

[7] Plaintiff filed a Chapter 13 bankruptcy petition on April 2, 2010, in the United States Bankruptcy Court for the Southern District Georgia. (Pringle Dep. at 212-14 & Ex. 27.) During the pendency of the bankruptcy proceedings, Plaintiff failed to disclose that she filed an EEOC charge and failed to disclose that she filed the instant lawsuit against Defendant. (Id. at 215-16 & Ex. 26.)

Plaintiff, Aon Hewitt and Defendant throughout the course of Plaintiff's eight month medical leave of absence. The content of the communications largely pertain to Plaintiff's requests to extend her leave.

Plaintiff argues that the Jarrett declaration is inadmissible because 1) Defendant failed to disclose Mr. Jarrett as a witness in its initial disclosures and discovery responses; and 2) Mr. Jarrett lacked personal knowledge of the subject matter because he was hired after Plaintiff was automatically terminated.

Under Federal Rule of Civil Procedure 56(c)(4), an affidavit or declaration used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4); <u>Broughton v. School Bd. of Escambia Cnty, Fla.</u>, 540 F. Appx. 907, 911 (11th Cir. 2013)(district court did not abuse its discretion in Title VII case by striking affidavit under Rule 56(c)(4) because its factual allegations were not based on personal knowledge).

Here, Mr. Todd Jarrett's declaration was not made on personal knowledge, although he states otherwise in the declaration itself, because he was not employed with Aon Hewitt

during Plaintiff's employment. The facts giving rise to this case occurred between June 2009 and January 2010. Mr. Jarrett was hired in June 2010. His declaration is simply commentary on the records. Thus, his declaration is struck.

That said, Mr. Jarrett was given responsibility over employees who had handled Plaintiff's case several months earlier, and he is the appropriate custodian of the records documenting her case. The records attached to his declaration are the best evidence of the time line and content of the communications between Plaintiff and Defendant. Thus, the records are admitted. This is a minor issue, however, because neither the declaration nor the attached records play a prominent role in the Court's resolution of this case.

### III. MOTIONS FOR SUMMARY JUDGMENT

#### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus.

_Co. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." _U.S. v. Four Parcels of Real Prop._, 941 F.2d 1428, 1437 (11th Cir. 1991) _(en banc)_(internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. _Fitzpatrick v. City of Atlanta_, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See _Clark v. Coats & Clark, Inc._, 929 F.2d 604, 606-08 (11th Cir. 1991)(explaining _Adickes v. S.H. Kress & Co._, 398 U.S. 144 (1970) and _Celotex Corp. v. Catrett_, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. _Jones v. City of Columbus_, 120 F.3d 248, 254 (11th Cir. 1997)(_per curiam_). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. _Clark_,

929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Clerk has given the non-moving parties notice of the motion for summary judgment and the summary judgment rules, of

the right to file affidavits or other materials in opposition, and of the consequences of default. (Docs. nos. 57, 58.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985)(<u>per curiam</u>), are satisfied. The time for filing materials in opposition has expired, and the motions are ripe for consideration.

**B. Analysis**

Plaintiff claims that Defendant's decision to automatically terminate her employment for failing to return from leave was improperly based on her race, sex, and disability. Plaintiff also presents a negligent supervision claim under state law. Defendant moves for summary judgment as to all of Plaintiff's claims on the merits and on the grounds of judicial estoppel, while Plaintiff moves for summary judgment only as to her disability discrimination claim. The Court addresses each in turn, starting with the cross-motions for summary judgment under the A.D.A., then resolving Defendant's various additional motions.

1. Cross-Motions for Summary Judgment as to Plaintiff's Disability Discrimination Claim under the A.D.A.

The A.D.A. prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such an individual in regard to job application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of employment." 29 U.S.C. § 12112(a). In this case, Plaintiff claims that Defendant terminated her employment because of her bunion-related disability in violation of the A.D.A.

In order to establish a prima facie case of discrimination in violation of the A.D.A., a plaintiff must show that: (1) she has a disability; (2) she was a qualified individual; and (3) she was discriminated against because of her disability. <u>Carruthers v. BSA Advertising, Inc.</u>, 357 F.3d 1213, 1215 (11th Cir. 2004). An individual has a disability if she: 1) has a physical or mental impairment that substantially limits one or more of her major life activities; 2) has a record of such an impairment; or 3) is regarded as having such an impairment. 29 U.S.C. § 12102(2). Plaintiff insists that she was disabled under both the first and third categories when Defendant terminated her employment in January 2010. Defendant argues that she was not disabled primarily because her doctor cleared her to return to work full-time with no restrictions and therefore urges that she fails to establish a prima facie case.

Despite the parties' extensive briefing and litigation of this issue, this is not a difficult issue to resolve given the uncontroverted testimony of Plaintiff's physician and her own

testimony. Plaintiff admits that she had no limitations at any time on her work prior to her bunion surgery in June 2009, never sought medical treatment for her condition until June 2009, and was fully aware that her doctor released her to return to work full-time without any restrictions on January 4, 2010.

Plaintiff's physician, Dr. Smith, testified that he sent Plaintiff back to work with no restrictions because she had fully recovered from surgery. After he released her to return full-time on January 4, Plaintiff went back to him and asked to be put on part-time restrictions. He signed a restriction to that effect, which Plaintiff brought to her employer.

The part-time work accommodation was Plaintiff's idea after consulting with her employer; it was not Dr. Smith's idea. It may have been a reasonable transition plan for her to use a part-time schedule to ease back into the workplace following her operation, Dr. Smith observed, but working part-time rather than full-time was certainly not medically necessary. She reported to him that she felt better after the surgery than before the surgery, so Dr. Smith reasoned that she certainly should be able to return to what she was doing prior to her operation. She simply chose not to do that, for whatever reason. Given these facts, it would be antithetical to the A.D.A. to find that Plaintiff fell into any of the three categories of "disabled" when Defendant

automatically terminated her employment. Having failed to establish a prima facie case, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment as to her A.D.A. claim.

    <u>2. Defendant's Motion for Summary Judgment as to Plaintiff's Race and Sex Discrimination Claims under Title VII</u>

In addition to an allegation of disability discrimination, Plaintiff also alleges that Defendant terminated her because she was an African-American female. Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Because Plaintiff has not presented any direct evidence of discrimination, the Court must analyze her disparate treatment claim under Title VII using the framework outlined by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Wright v. Southland Corp.</u>, 187 F.3d 1287, 1293 (11th Cir. 1999).

In a disparate treatment case, the plaintiff bears the ultimate burden of proving that the employment action at issue was taken because of the plaintiff's protected status. <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1274 (11th Cir. 2000)(citations omitted). Under the <u>McDonnell Douglas</u> framework,

the plaintiff must first come forward with a prima facie case of employment discrimination.

If the plaintiff establishes a prima facie case, she raises the inference that discriminatory intent motivated the challenged action. A feather-weight burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action in question. Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997). If the defendant carries its burden, the plaintiff retains the burden of persuasion to show that the employer's proffered explanation was not the real reason for the employment change, but was instead a pretext for discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1980).

If, however, the plaintiff fails to establish a prima facie case for discrimination, summary judgment in favor of defendant is proper. Summer v. City of Dothan, Ala., 444 F. Appx. 346, 350 (11th Cir. 2011)(affirming district court summary judgment in favor of employer where former employee alleging race and sex discrimination under Title VII failed to establish a prima facie case for discrimination).

To establish a prima facie case of disparate treatment, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her

employer treated similarly situated employees who were not of the same protected class more favorably; and (4) she was qualified to do the job. <u>Maynard v. Board of Regents</u>, 342 F.3d 1281, 1289 (11th Cir. 2003)(citations omitted); <u>Holifield</u>, 115 F.3d at 1562. The parties do not dispute that Plaintiff, an African-American female, is a member of a protected class, that she was qualified for the job, and that she suffered adverse employment action. They disagree, however, as to whether Plaintiff was treated less favorably than similarly situated employees of different race and sex.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999)(citations omitted). Plaintiff bears the burden of showing adequate similarities between her conduct and that of others outside her protected class. <u>Summers v. City of Dothan, Ala.</u>, 444 F. Appx. 346, 348 (11th Cir. 2011)(<u>citing</u> <u>Maniccia</u>, 171 F.3d at 1369 ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges.")

Here, Plaintiff's conduct that led to her termination was her eight month medical leave of absence and her request for a part-time schedule upon returning from that leave of absence. The sole basis for Plaintiff's sex and race discrimination claim is that a white male earning a higher salary filled in for her while she was gone and permanently replaced her when she failed to return from leave. Warbington, Plaintiff's white male replacement, is not a "similarly situated" person (a comparator) because he and Plaintiff differ in several respects.

Warbington is not a comparator because there is no evidence showing that he attempted to return from a medical leave of absence. In other words, if Plaintiff was able to point to a white male store manager who had taken medical leave, had requested to come back to work on a part-time basis, and Defendant had granted that request, then that person may be a good comparator. But Warbington never received treatment, favorable or otherwise, under Defendant's leave and attendance policy and therefore is not a "similarly situated" person.

Plaintiff takes issue with the fact that Warbington was paid more than she was and points to this as evidence of racial and gender discrimination. Consistent with Defendant's policies, Defendant did not reduce Warbington's salary when he was transferred to the smaller store during Plaintiff's medical leave

of absence. Plaintiff is not similar to Warbington in that they were promoted to store managers at different stores with different sales volumes, a neutral factor in determining salaries, and therefore were compensated at different rates.

In addition to finding that Plaintiff fails to present a comparator who received different treatment under Defendant's attendance and leave policies, the Court notes that there is very little evidence in the record to support a race or gender discrimination claim under Title VII. This is not a case where Plaintiff's supervisor has had previous complaints lodged against her for inappropriate comments or misconduct in the workplace. Plaintiff's suit is the first. Plaintiff admitted in her deposition that she does not recall Bales ever making race or gender related comments. In the absence of a prima facie case or other evidence of discrimination, therefore, summary judgment in favor of Defendant is proper on Plaintiff's Title VII claims. See Summer v. City of Dothan, Ala., 444 F. Appx. at 350 (affirming summary judgment for defendant where plaintiff failed to make a prima facie case for sex and gender discrimination under Title VII); Word v. AT&T, 2014 WL 3928951, at *5 (11th Cir. Aug. 13, 2014)(affirming summary judgment for former employer where an African American female former employee alleged violations of Title VII and the A.D.A. for race, sex, and disability

34

discrimination but failed to make a prima facie case); Holifield, 115 F.3d at 1562 ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."); Chapman v. AI Transp, 229 F.3d 1012, 1030 (11th Cir. 2000)("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.")

### 3. Defendant's Motion for Summary Judgment as to Plaintiff's Negligent Supervision Claim

Plaintiff alleges that Defendant was grossly negligent in failing to properly monitor and supervise Plaintiff's supervisor, Bales, once Plaintiff requested disability accommodations and medical leave. Defendant's gross negligence, Plaintiff urges, directly and proximately resulted in injury to Plaintiff, namely Plaintiff's wrongful termination. Defendant allegedly acted with reckless indifference to Plaintiff's rights and/or Defendant acted with actual or imputed knowledge that the inevitable or probable consequences of its actions or omissions would result in harm to Plaintiff and in violation of her rights under federal and state law. (Am. Compl. ¶¶ 58-60.)

Under Georgia law, "the employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency." Herron v. Morton, 155 F.

Appx. 423, 425 (11th Cir. 2005)(citing O.C.G.A. § 34-7-20). Both the Eleventh Circuit and the Georgia Supreme Court hold that liability for negligent hiring or retention requires evidence that the employer knew or reasonably should have known of the employee's propensity to engage in the type of conduct that caused the plaintiff's injury. Id. at 425-26 (citing Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1247 (11th Cir. 2001), and Munroe v. Universal Health Servs., Inc., 596 S.E.2d 604, 606 (2004)).

As noted in the previous section, Defendant never received a complaint of discrimination against Bales in her eleven years of employment with Defendant prior to the facts that gave rise to this suit. Defendant was not aware and had no reason to be aware of any foreseeable harm to Plaintiff or anyone else from Bales. The Court **GRANTS** summary judgment for Defendant on Plaintiff's negligent supervision claim.

### 4. Defendant's Motion for Summary Judgment on Grounds of Judicial Estoppel

Defendant argues that Plaintiff should be judicially estopped from pursuing her claims against Defendant because Plaintiff failed to disclose them in her bankruptcy proceedings. Under the doctrine of judicial estoppel, a party is precluded from asserting a claim in a legal proceeding that is inconsistent

36

with a claim taken by that party in a previous proceeding. <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001); <u>Burnes v. Pemco Aeroplex, Inc.</u>, 291 F.3d 1282, 1285 (11th Cir. 2002). The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. The Court does not reach this issue, however, because the Court resolves Plaintiff's A.D.A. and Title VII claims on the merits in favor of Defendant.

## IV. DEFENDANT'S REQUEST FOR SANCTIONS

Defendant requests attorneys' fees and costs incurred in responding to Plaintiff's motion for summary judgment because her motion is frivolous. Specifically, Defendant asserts that Plaintiff's suit is based completely on a lie: that Plaintiff was disabled. When Plaintiff requested a part-time indefinite work schedule as an alleged accommodation from Defendant on January 14, 2010, Plaintiff suffered from no medical condition and had no medical restrictions on any of her life activities, including her ability to return to work full-time. This became clear through Plaintiff's deposition on July 23, 2013, and her doctor's deposition on August 2, 2013. Nonetheless, Defendant argues, Plaintiff's counsel continued to represent to the Court that

Plaintiff was disabled and filed a motion for summary judgment on her A.D.A. claim.

Sanctions under Rule 11 of the Federal Rules of Civil Procedure are proper (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when the party files a pleading in bad faith for an improper purpose. Davis v. Carl, 906 F.2d 533, 536 (11th Cir. 1990) (explaining that sanctions premised on factually groundless allegations are appropriate when plaintiffs offered no evidence to support their allegations); see Fed. R. Civ. P. 11(c).

The core facts in this case, particularly the testimony of Plaintiff's doctor, are uncontroverted and clearly favor Defendant. But it would be a mischaracterization of Plaintiff's motion for summary judgment to say that she presented no evidence to support her allegations. The Court therefore declines to impose sanctions. See Manhattan Const. Co. v. Place Properties LP, 559 F. Appx. 856, 858 (2014)(concluding that district court did not abuse its discretion in declining to impose sanctions).

## V. CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (doc. no. 55) is hereby **GRANTED** and Plaintiff's partial motion for summary judgment (doc. no. 56) is **DENIED**. Further, Defendant's request for an award of attorneys' fees and costs (doc. no. 71) is **DENIED**. The Clerk is directed to enter **FINAL JUDGMENT** in favor of Defendant, terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this $30th$ day of September, 2014.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA